[Civ. No. 2863. Fourth Dist. Sept. 14, 1942.]

JOHN SAMUEL WINKLER, Respondent, v. ROXIE VIOLA WINKLER, Appellant.

Charles B. Provence for Appellant.

G. L. Holloway for Respondent.

GRIFFIN, J.—Respondent commenced this action against his wife for divorce based upon the ground of desertion. Appellant wife answered, denied the allegations of respondent's complaint and by way of cross-complaint alleged: (1) extreme cruelty; (2) habitual intemperance; and (3) wilful neglect on the part of respondent. After hearing the evidence produced, the trial court refused to grant a divorce to respondent or cross-complainant and appellant and denied her a judgment for support and maintenance. Cross-complainant appealed from that portion of the judgment denying her a divorce or any relief by way of maintenance or support.

Appellant and respondent were married in 1908. They have four children, all of the age of majority. The parties hereto accumulated some property in the State of Oregon, where they resided. About January 1st, 1939, appellant

came to San Diego County and lived at the homes of her several children. Later respondent came here and now resides at Sunnyside, San Diego County, where he maintains a filling station. The property in Oregon consisted of a home and a filling station. By agreement that property was mutually divided between them.

In support of her allegation of cruelty, appellant produced evidence, consisting mainly of her own testimony, of a quarrel between appellant and respondent which occurred in Oregon shortly before their separation and at the time when the mutual deeds to the property above mentioned were exchanged.

Appellant testified that on December 28, 1938, at about 5:30 p. m., Mr. Winkler came home from his work; that their boy Winifred was present with a friend of his on that occasion; that the family were in the habit of eating their evening meal at 6 p. m.; that on respondent's arrival home he immediately demanded his supper; that he grabbed a frying pan; that appellant told him that dinner was not ready but it would be at 6 o'clock; that as the outgrowth of this argument Mr. Winkler set the frying pan down, grabbed appellant by the arm and shook her; that she screamed and her son came in from the front room; and that respondent was threatening her and using bad language. She then testified that ''until he got so rough that I kept saying a little louder every time he would shake me —squeeze my arm and shake me—until I spoke so loud that my son came in, and he had his fist drawed back on me and my son said, 'Don't hit her,' or 'Don't strike her,' I don't know which words he used. Then he yelled to him and he ordered him out of the house and my son says, 'Do you mean it, Dad? If you do, I will go.' . . . they kept arguing backward and forth and they had their fists drawed on each other and finally he said, 'I will put you out of here,' said, 'I got something I can put you out of here,' and he run for his gun. He stepped inside his bedroom door and picked up the gun and made the remark, says, 'I am ready for you.' And I said 'Winnie, don't do that.' I says, 'Please go outside; don't let this happen to me.' I said, 'Don't let this happen to me,' and he stepped outside. His father came in with the gun and just hunted for him like he was a dog, with the gun in his hand ready to shoot, and he looked all around in that room and I said, 'He is not in here.' He

looked in my second room and he wasn't there, and he ran to the back door and looked to one side and the other and then came back and grabbed me and he threatened me; threatened to hit me. He grabbed my head and stuck it under his arm and drawed the gun back and said, 'I will just hit you with the side of it,' and I jerked my head out from under his arm and I said, 'Hit.' . . . Then he said, 'I will just shoot the pots off the stove,' and I said 'all right' and he pulled the trigger three times and it did click but didn't fire. Then he ran to the bedroom to hunt for his shells . . . and I left the house." She further testified that "when that occurred, I felt that my life was in danger and my son's life was in danger and I asked him for a settlement. That is when the settlement came about." She then testified that on a previous occasion respondent had been drunk for a period of nine months; that he left her and went to Florida; that he was "drunk and just got mad and run off"; that he came back to her on the terms "that he was to quit drinking and running around at night, and within two or three weeks time he come in drunk, drinking; and he kept it up for the nine months. There wasn't hardly a day but what he was drinking and I never knew what time he was going to come in, raising a racket, and some times when I would see him coming he would just give me a nervous chill, and it worked on my nerves continuously."

Respondent, in testifying as to this affair, was quite evasive, and to a great extent corroborated appellant's testimony on this subject. He testified in answer to the question "Did you ever strike Mrs. Winkler?" "A. One time . . . 1930 . . . Struck her with my hand, open hand." He denied striking her in December, 1938, but said, "I just shook her, that's all"; that "I don't remember anything about drawing a gun." As to the intoxication, he stated that "Well, I drink some; not excessively . . . I have had some drinks, but I haven't been so drunk but what I know what I was doing and take care of my own business."

One other witness testified that one time in Oregon when Mr. Winkler came home he "tried to force Mrs. Winkler to drink"; that she refused to drink with him; that he "poured it, spilled it on her face, and the liquor, whatever it was, ran down." This was in 1932.

After considering the evidence presented, the trial court announced that respondent did not make out a case of de-

sertion; that none of the testimony "would furnish affirmative ground for granting anybody any divorce, for the reason it isn't corroborated, either her story or his, by anybody outside of the parties, and section 130 of the Civil Code requires such corroboration before any divorce may be granted"; that "So far as now appears, either party might propose the resumption of cohabitation to the other and place the other in default, were such cohabitation refused. Neither party appears to have done it. The situation is that they are simply living apart *de facto,* without any sufficient showing here for the court to award any affirmative relief on the ground that either the one party or the other is entirely to blame for it."

Counsel for appellant then announced that the boy, Winifred was on vacation and would be back in ten days; that "Since your Honor has indicated how he feels about the matter, I think in fairness to both parties we should have the testimony so that we can get this definitely settled and prevent future action. I therefore move for a continuance of two weeks until the boy returns so that we can put that evidence on." The court then remarked that "there ought to have been an application before the case was brought to trial. Motion denied."

On a motion for a new trial counsel for appellant made an affidavit that on September 15, 1941, he received notice that the case was set for trial on September 19, 1941; that "Winifred Winkler . . . was on vacation at that time and could not be located; that he was not within the County of San Diego and could not be reached by any form of communication; that the defendant sent telegrams in an effort to have him here for the trial, but could not contact him in time; that affiant was informed by the defendant that it was very probable that the said Winifred Winkler would return in time to appear as a witness on the 19th of September, the trial date . . . that affiant believed said witness would appear in time to testify . . .; that affiant called the court's attention to the absence of said witness on the trial date and on that day requested an opportunity to produce the testimony of said witness. That the said witness . . . has now returned to San Diego County, that he is now and will be available to testify in this action to the facts as set forth in his affidavit filed herewith." The affidavit of the witness above mentioned recites generally that in Decem-

ber, 1938, his father, "John Winkler, came home half drunk, about 5:30 p. m. and demanded his supper to be served to him immediately, that dinner was not yet ready and the customary time for dinner was 6 p. m.; that the plaintiff used abusive language towards the defendant, Mrs. Winkler, grasped her with his hands and shook her and became so violent and abusive that affiant intervened and stopped him by telling him that he had better be careful; that thereupon the plaintiff, Mr. Winkler, started to attack affiant and then said 'I will get something that will stop you' and went for his gun; that at the request of my Mother I then left the house and hid behind a tree and saw my Father come out of the house with a pistol in his hand looking for me. That prior to the above occasion Mr. Winkler, the plaintiff, habitually drank intoxicating liquors, was around the house in an intoxicated condition and was abusive to the defendant Mrs. Winkler. That Mrs. Winkler was at all times a good mother and wife and was a good housekeeper and cook. That Mrs. Winkler's health is now bad and she is unable to earn her livelihood. That the plaintiff is an able bodied man and earning good money and able to support himself and the defendant."

The facts set forth in these affidavits were not denied by respondent and no counter-affidavits were filed. The trial court nevertheless denied the motion for new trial. The only question here presented is whether it abused its discretion in refusing to reopen appellant's case for the purpose of presenting the evidence offered and in denying her motion for a new trial under the circumstances here related.

While these orders are not appealable they are reviewable on an appeal from the judgment. (§ 956 Code Civ. Proc.; *Lewith* v. *Rehmke*, 217 Cal. 563 [20 P. (2d) 687].) It has often been held that it is not entirely necessary that all the evidence of the prevailing party in a divorce action be corroborated. (*Keller* v. *Keller*, 132 Cal. App. 343, 348 [22 P. (2d) 798]; *Bastjan* v. *Bastjan*, 215 Cal. 662, 664 [12 P. (2d) 627].)

In *White* v. *White*, 86 Cal. 219 [24 Pac. 996], it was stated (quoting from syllabus):

"Though the court cannot grant a divorce on the ground of extreme cruelty of the husband upon the uncorroborated testimony of the wife, it is not under such restraint when considering whether the leaving of the husband by the wife

constituted wilful desertion or was justified by his cruel treatment, and upon that issue the court may believe the uncorroborated testimony of the wife as against the testimony of the husband.''

 The trial court found that appellant refused and neglected to furnish cross-complainant with the common necessaries of life, but that ''during the times therein mentioned defendant and cross-complainant was living separate and apart from plaintiff and cross-defendant and therefore not entitled to support from him.'' The court then found that she did not desert respondent and that the respondent did not desert her. We fully recognize the general rule that a court has a wide discretion in passing upon such motions as were here presented. Nevertheless, these motions should be examined, not only in accordance with legal principles, but in accordance with the ends of justice. Counsel for appellant proceeded to trial believing he had sufficient corroboration of his client's testimony. Due to her illness and extreme nervousness, he thought it advisable to proceed under these circumstances without the presence of the boy whom he expected would return before the case was finally completed. Counsel's inadvertence in this respect should be considered and appellant should not necessarily be deprived of her right to the benefit of the testimony of her son under the facts of this case.

Considering all of the testimony before the trial court and the most substantial corroboration offered by the son, if true, it would appear to us that the appellant would be entitled to a decree of divorce, at least. From the evidence and the affidavit presented, had a new trial been granted, a different decision would no doubt have been reached. We believe, under the peculiar circumstances here existing, the trial court should have granted a continuance of the case for the purpose of hearing the evidence offered or, upon the showing made by the *undenied* affidavits considered by the court, it should have granted a new trial for the purposes suggested. It is our belief that the ends of justice would have been better subserved by so doing and that the court's refusal so to do amounted to an abuse of discretion. (*Christina* v. *Daneri,* 22 Cal. App. (2d) 190 [70 P. (2d) 983]; *Leslie* v. *Federal Finance Co., Inc.,* 14 Cal. (2d) 73, 82 [92 P. (2d) 906]; *Spear* v. *United Railroads,* 16 Cal. App. 637 [117 Pac. 956].)

For the reasons given the portion of the judgment appealed

from is reversed with directions to the trial court to grant the motion for new trial.

Barnard, P. J., and Marks, J., concurred.